# NOTE:

# THIS IS A PARTIALLY SCANNED DOCUMENT.

# PLEASE SEE THE CASE FILE FOR ATTACHMENTS, EXHIBITS, AFFIDAVITS OR OTHER MATERIAL WHICH HAS NOT BEEN SCANNED.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
Case No.: 3: 01CV318-MU



PREMIER SYSTEMS
INTEGRATORS, LLC,

        Plaintiff and Counterdefendant,

    v.

EDUCATION NETWORKS
OF AMERICA, INC.,

        Defendant and Counterplaintiff.

---

## ANSWER AND COUNTERCLAIM

### I. ANSWER

The defendant, Education Networks of America, Inc. ("ENA"), states for its answer to the complaint filed by the plaintiff, Premier Systems Integrators, LLC ("PSI"), as follows:

### FIRST DEFENSE

1.      Upon information and belief, ENA admits the allegations set forth in the first grammatical sentence of numbered paragraph 1 of the complaint, but denies that either the state of legal organization or the principal place of business of PSI is of legal significance, since PSI is deemed to be a citizen of the states of which its members are citizens, not a citizen of its state of legal organization or its principal place of business. ENA denies all remaining or inconsistent allegations set forth in the first grammatical sentence of numbered paragraph 1 of the complaint. ENA admits the allegations set forth in the second grammatical sentence of the complaint.

2.    ENA admits the allegations set forth in numbered paragraph 2 of the complaint.

3.    ENA denies the allegations set forth in the first grammatical sentence of numbered paragraph 3 of the complaint. ENA admits that it and PSI entered into an agreement titled "Proposal For Initial Network Discovery" dated April 13, 2000, an agreement titled "Enterprise Network Management Project" dated May 31, 2000, and an agreement titled "SQL Server DBA Project" dated July 25, 2000, which contain ENA's consent to jurisdiction of the courts of North Carolina. ENA denies all remaining or inconsistent allegations set forth in the second grammatical sentence of numbered paragraph 3 of the complaint.

4.    Numbered paragraph 4 of the complaint does not require a response of ENA. To the extent a response is deemed required, ENA incorporates its responses to numbered paragraphs 1 through 3 above as if fully set forth herein.

5.    ENA admits that on May 31, 2000, it entered into an agreement with PSI titled "Enterprise Network Management Project," the terms of which speak for themselves. ENA denies all the remaining or inconsistent allegations set forth in the first grammatical sentence of numbered paragraph 5 of the complaint. ENA admits the allegations set forth in the second grammatical sentence of numbered paragraph 5 of the complaint.

6.    ENA admits that on or about July 25, 2000, it entered into an agreement with PSI titled "SLQ Server DBA Project," the terms of which speak for themselves. ENA denies all remaining or inconsistent allegations set forth in the first grammatical sentence of numbered paragraph 6 of the complaint. ENA is without knowledge or information sufficient to form a belief

Case 3:01-cv-00318-GCM    Document 3    Filed 06/20/01    Page 3 of 35

as to the truth of the allegations set forth in the second grammatical sentence of numbered paragraph 6 of the complaint. ENA admits that the "SQL Server DBA Project" agreement was modified by written addendum dated October 26, 2000, the terms of which speak for themselves. ENA denies all remaining or inconsistent allegations set forth in the third grammatical sentence of numbered paragraph 6 of the complaint.

7.     ENA denies the allegations set forth in numbered paragraph 7 of the complaint.

8.     ENA denies the allegations set forth in the first grammatical sentence of numbered paragraph 8 of the complaint. ENA admits that the terms of the Network Management Agreement speak for themselves and, except as admitted, denies all remaining or inconsistent allegations set forth in the second grammatical sentence of numbered paragraph 8 of the complaint.

9.     ENA denies the allegations set forth in numbered paragraph 9 of the complaint.

10.     ENA denies the allegations set forth in numbered paragraph 10 of the complaint.

11.     ENA denies the allegations set forth in numbered paragraph 11 of the complaint.

12.     ENA denies the allegations set forth in numbered paragraph 12 of the complaint.

13. ENA denies the allegations set forth in numbered paragraph 13 of the complaint.

14. Numbered paragraph 14 of the complaint does not appear to require a response of ENA. To the extent a response is deemed required, ENA denies that PSI is entitled to any relief under the referenced statute.

15. Numbered paragraph 15 of the complaint does not appear to require a response of ENA. To the extent a response is deemed required, ENA incorporates its responses to numbered paragraphs 1 through 3 above as if fully set forth herein.

16. ENA denies the allegations set forth in numbered paragraph 16 of the complaint.

17. ENA is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in numbered paragraph 17 of the complaint.

18. ENA denies the allegations set forth in numbered paragraph 18 of the complaint.

19. ENA denies the allegations set forth in numbered paragraph 19 of the complaint.

20. Numbered paragraph 20 of the complaint does not appear to require a response of ENA. To the extent a response is deemed required, ENA incorporates its responses to numbered paragraphs 1 through 19 above as if fully set forth herein.

21. ENA denies the allegations set forth in numbered paragraph 21 of the complaint.

22. ENA denies the allegations set forth in numbered paragraph 22 of the complaint.

23. ENA denies the allegations set forth in numbered paragraph 23 of the complaint.

24. Numbered paragraph 24 of the complaint does not appear to require a response of ENA. To the extent a response is deemed required, ENA incorporates its responses to numbered paragraphs 1 through 23 above as if fully set forth herein.

25. ENA admits the allegations set forth in the first grammatical sentence of numbered paragraph 25 of the complaint. ENA is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second grammatical sentence of numbered paragraph 25 of the complaint.

26. ENA denies the allegations set forth in numbered paragraph 26 of the complaint.

27. ENA denies the allegations set forth in numbered paragraph 27 of the complaint.

28. ENA denies the allegations set forth in numbered paragraph 28 of the complaint, since such allegations make reference to "actions" denied by ENA in response to numbered paragraph 27 of the complaint.

29.     ENA denies the allegations set forth in numbered paragraph 29 of the complaint.

30.     ENA denies the allegations set forth in numbered paragraph 30 of the complaint.

31.     ENA denies all allegations of the complaint not heretofore specifically admitted or denied.

### SECOND DEFENSE

32.     PSI has failed to state a claim against ENA upon which relief can be granted.

### THIRD DEFENSE

33.     ENA is entitled to deduct its damages against the price (within the meaning of the Uniform Commercial Code) allegedly due to PSI under the alleged contracts.

### FOURTH DEFENSE

34.     To the extent PSI establishes a right of recovery against ENA, ENA relies upon the rights of setoff and recoupment, and further relies upon the allegations of its counterclaim, set forth below, in this regard.

### FIFTH DEFENSE

35.     ENA relies upon the affirmative defenses of estoppel, failure of consideration, waiver and fraud, as plead more particularly in its counterclaim, set forth below.

### SIXTH DEFENSE

36.     PSI is barred from equitable relief by its unclean hands.

## SEVENTH DEFENSE

37.     ENA further relies upon the allegations of its counterclaim, set forth below.

## EIGHTH DEFENSE

38.     ENA reserves the right to assert additional defenses upon further information and discovery.

## JURY DEMAND

39.     ENA demands a trial by jury.

WHEREFORE, having fully answered PSI's complaint, ENA prays that:

A.     The complaint be dismissed with prejudice;

B.     Judgment be entered in ENA's favor and against PSI on PSI's claims;

C.     ENA be awarded its reasonable attorneys' fees and costs in accordance with N.C. Gen. Stat. § 75-16.1(2), since PSI knew, or should have known, that the claims it filed in this action under N.C. Gen. Stat. § 75-1.1 were frivolous and malicious, entitling ENA to an award of a reasonable attorney fee if it prevails in this action;

D.     ENA receive a trial by jury; and

E.     ENA be granted such other and further relief as the Court deems just and equitable.

## II. COUNTERCLAIM

Assuming the role of counterplaintiff, Education Networks of America, Inc. ("ENA") states for its counterclaim as follows:

Case 3:01-cv-00318-GCM    Document 3    Filed 06/20/01    Page 8 of 35

## SUMMARY OF ALLEGATIONS

1.      ENA provides Internet service and related network administration to approximately 1,800 Tennessee schools, as well as Internet filtering, caching and networking services to schools in other states. In 2000, ENA contracted with Premier Systems Integrators, LLC ("PSI"), which holds itself out as a sophisticated provider of a "totally customized turnkey approach . . . in outfitting companies with e-business infrastructure needs," to study, design and implement enhancements and modifications to crucial aspects of ENA's computer and network resources. In agreeing to the scope of PSI's work and the goods and services to be delivered thereunder, the division of PSI's work into two (2) stages and the deadlines for the completion of that work, all as set forth in the parties' Network Management Agreement of May 31, 2000, ENA relied upon various representations and recommendations made by PSI. Despite the fact that ENA has paid PSI more than $3 million, PSI has failed to deliver the goods and services called for under the Network Management Agreement (as defined below), has failed to deliver those goods and services within agreed-upon deadlines, has breached express and implied warranties, and has grossly overbilled and mismanaged work under the Network Management Agreement, the SQL DBA Agreement and SQL DBA Addendum, and the Windows 2000 Agreement (as those terms are defined below). Moreover, PSI has either purposefully or, at a minimum, negligently misrepresented the expertise of its personnel and the functionality of its goods and services and failed to document the hours and expenses it has charged to ENA, thus breaching various common law and statutory duties owned to ENA, all as more fully alleged below.

## PARTIES

2.     ENA is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Nashville, Tennessee. ENA provides Internet service and related network administration to approximately 1,800 public schools in the State of Tennessee and to schools in other states and provides Internet filtering and caching services for schools in several states.

3.     The counterdefendant, Premier Systems Integrators, LLC ("PSI"), is, upon information and belief, a limited liability company with its principal place of business in Charlotte, North Carolina. According to its advertising, PSI "designs, provisions, builds and manages Internet and Intranet infrastructures that support business-critical applications."

## JURISDICTION

4.     This court has supplemental jurisdiction over the claims of this counterclaim pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

5.     PSI holds itself out as an expert computer systems integrator and claims to specialize in large and complex computer systems integration and networking. PSI also claims to take a "totally customized turnkey approach ... in outfitting companies with e-business infrastructure needs." PSI is also a reseller of computer equipment (hardware) and software and sells hardware and software in connection with its sales to computer systems integration customers. Upon information and belief, in 2000, PSI had sales revenues of approximately $152 million and employed approximately 200 persons in offices across the country.

Case 3:01-cv-00318-GCM     Document 3     Filed 06/20/01     Page 10 of 35

6.    In April 2000, ENA consulted with PSI concerning the management of ENA's computer network. As a result of these consultations, ENA and PSI entered into an agreement titled "Proposal for Initial Network Discovery" dated April 13, 2000 ("Network Discovery Agreement"). A true and correct copy of the Network Discovery Agreement is attached hereto as **Exhibit A.**

7.    As part of the Network Discovery Agreement, PSI was to map a portion of the existing ENA customer network to gain an understanding of the size and complexity of the entire ENA customer network in Tennessee. Under the Network Discovery Agreement, PSI was then to use the mapping information to develop an implementation plan for the Network Node Manager, or NNM, a computer system for managing a large computer network. PSI was also to document fully the ENA network and to review what other third party network management tools should be integrated into ENA's NNM.

8.    The Network Discovery Agreement, prepared by PSI, sets forth a number of terms which appear to be standard provisions in PSI contracts, based on ENA's later experience with PSI, addressed further below. Among these provisions are a Change Order Process under which any changes to the Scope of Work section of the agreement are to be addressed. This Change Order Process, sometimes referred to by PSI as its Change Control Process (hereinafter "Change Order Process") is to proceed as follows:

> 1.    Client documents additional requirements and/or required functionality as a change request initiated by Client, or PSI will submit a change recommendation to Client for changes initiated by PSI.

2. PSI provides a quote to Client specific to the additional request.

3. Client and PSI agree on changes, including the delivery timeframe.

4. Client accepts changes and provides an addendum to this proposal and the purchase order.

9. PSI proceeded to perform under the Network Discovery Agreement and, based upon the information learned by PSI in connection therewith and further consultation with ENA, PSI prepared a recommendation concerning the management of ENA's customer computer network titled "Network Management and Change Control Design for ENA" dated May 12, 2000.

10. Of particular concern to ENA in connection with the management of its customer computer network was the management of its "trouble ticket" system, sometimes also referred to as its help desk system. This trouble ticket system is used to identify, track and address problems with the ENA customer network.

11. PSI made recommendations to ENA concerning the management of its trouble ticket or help desk system. PSI's recommendations in this regard are incorporated in its proposals to ENA in a "Enterprise Network Management Project" agreement dated May 31, 2000 ("Network Management Agreement"). A true and correct copy of the Network Management Agreement is attached hereto as **Exhibit B**.

12. Under the Network Management Agreement, PSI was to implement the first two (2) of four (4) stages recommended by PSI under its "Network Management and Change Control Design for ENA" recommendation of May 12, 2000. These two (2) stages were titled "Documentation and Infrastructure" and "Monitoring Tools and Remedy Help Desk." Under the

Case 3:01-cv-00318-GCM    Document 3    Filed 06/20/01    Page 12 of 35

Network Management Agreement, PSI was to document ENA's existing help desk (its customer service center, "CSC") process flow and review ENA's existing CSC information, install a hardware and software infrastructure (software known as "Remedy Help Desk") to automate the customer support functions and install related hardware and software to manage ENA's customer network, including components known as Hewlett-Packard's Open View Network Node Manager, Cisco Systems' CiscoWorks 2000, and the Remedy Action Request System and Remedy Help Desk applications. As stated in the Network Management Agreement, "[f]ollowing PSI's recommendation, ENA has decided to implement the stage one and stage two" set forth therein.

13. PSI promised that, regarding Stage 1, it would "document the existing help desk process flow, [ ] review existing help desk information," and install an infrastructure that would provide certain features and functionality. Regarding Stage 2, PSI promised to "install network-monitoring tools as required to monitor the ENA network" and "install and configure the Remedy Action Request System as required to support ENA business."

14. As stated by PSI in the Network Management Agreement, the primary goal of the second phase (titled "Monitoring Tools and Remedy Help Desk") "is to monitor the network, and have appropriate network problems generate a Remedy Help Desk ticket automatically. The secondary goal of this stage is to have all trouble tickets viewable to external and internal customers via the web interface. This will enable end-users to check on the current status of an open ticket."

15. PSI also made the following representations concerning the goods and services it was to provide to ENA under the Network Management Agreement in a presentation made to ENA titled "Tools for Schools": "The primary goal of this phase is to implement a robust,

scalable infrastructure to support the required network monitoring and the trouble ticket system being implemented." PSI's "Tools for Schools" presentation goes on to state: "The primary goal of this phase is to monitor the network and have appropriate network problems generate Remedy Helpdesk tickets automatically. As importantly, all trouble tickets will be viewable to external and internal customers via the web interface enabling end-users to check current status of an open ticket." A true and correct copy of PSI's "Tools for Schools" presentation is attached hereto as **Exhibit C**.

16. PSI agreed to complete the two (2) stages of work set forth in the Network Management Agreement, "Documentation and Infrastructure" and "Monitoring Tools and Remedy Helpdesk" by August 31, 2000.

17. Under the Network Management Agreement, the hardware and software components needed to complete these stages were priced at $1,354,430, and PSI's professional services were to be charged to ENA on a time and material basis as set forth in further detail on page 7 of the Network Management Agreement. PSI's "project managers" were to be billed at $225 per hour and its "experts" were to be billed at $200 per hour. The total project consulting cost was limited, however, to "$749,800 plus 10%." PSI's professional service fees were to be invoiced bi-weekly based on hours worked. PSI's out-of-pocket expenses including travel, lodging and other support expenses were to be billed at cost and such expenses were to be within the industry's customary and reasonable figures and in accordance with PSI's Travel and Time/Expenses Policy ("PSI Expenses Policy"). A true and correct copy of the PSI Expenses Policy is attached hereto as **Exhibit D**.

18.     Any changes to the project to be performed under the Network Management Agreement were to be approved by Rick Ash (PSI), Eric Benner (PSI), Paul Smith (ENA) and Rex Miller (ENA) and any such modifications to the scope of work of the project subject to the Network Management Agreement were to be handled through the Change Order Process, set forth above.

19.     Pursuant to the Warranty and Support provisions of the Network Management Agreement, "[c]ustomized products and integration services are supported against defects in material and workmanship for a thirty day period after installation."

20.     Pursuant to an agreement titled "SQL Server DBA Project" dated July 25, 2000 ("SQL DBA Agreement"), ENA engaged PSI to fill an employment position within the management of ENA's network known as the "SQL Server DBA" (database administrator) position. The SQL DBA Agreement provides that the SQL Server DBA billing rate from PSI to ENA was $200 per hour or approximately $32,000 per month, plus travel expenses to be billed by PSI to ENA on the same basis as set forth in the Network Management Agreement (subject to industry standards and the PSI Expenses Policy). Under the SQL DBA Agreement any changes to the project were to have been approved by Rick Ash (PSI), Bobbi Leidenheimer (PSI), Paul Smith (ENA) and Rex Miller (ENA). A true and correct copy of the SQL DBA Agreement is attached hereto as **Exhibit E.**

21.     By Addendum dated October 26, 2000 ("SQL DBA Addendum"), the SQL DBA Agreement was amended to include two (2) additional database administrators and the creation of a managing database administrator role. The billing rate for the database administrators was $200 per hour and the managing SQL Server database administrator's billing rate was $225 per

hour. The SQL DBA Addendum is subject to the Change Order Process. A true and correct copy of the SQL DBA Addendum is attached hereto as **Exhibit F**.

22. PSI has billed ENA $510,762.50 in consulting fees, plus $38,853.61 in expenses, under the SQL DBA Agreement and the SQL DBA Addendum.

23. By agreement titled "Contract Services Agreement ... Windows 2000 Migration Design" dated October 5, 2000 ("Windows 2000 Agreement"), ENA engaged PSI to design its migration and upgrade to Windows 2000. A true and correct copy of the Windows 2000 Agreement is attached hereto as **Exhibit G**.

24. The Windows 2000 Agreement is subject to the Change Order Process. In addition, the Windows 2000 Agreement provides that "[i]f additional hours are required to ensure a successful project, Premier will document the necessity and coordinate the additional billing with ENA. ENA will only be billed for the actual hours used."

25. Under the Windows 2000 Agreement, PSI was engaged on a time and materials usage basis at the rate of $250 per hour, with PSI estimating that it would take approximately 80 hours to complete the design, which would be a total of $20,000. However, PSI has billed ENA $88,350 under the Windows 2000 Agreement, exclusive of expenses.

26. Notwithstanding that the work set forth in the Network Management Agreement was supposed to have been completed by August 31, 2000, that project remains incomplete. Among other problems and issues that have become known to ENA, without limitation, are: (a) that PSI designed and purported to implement a Remedy system that does not perform as intended or provide accurate and complete external customer trouble ticket management

and network monitoring integration; (b) PSI's Remedy design did not allow for a "first call close," which is where a help ticket is closed after the first call, even though approximately sixty percent (60%) of ENA's help desk calls are closed on the first call; (c) PSI's Remedy design did not incorporate ENA's business and workflow practices, such as allowing for a customer service representative to take a ticket and to accept responsibility or "own" that ticket until the representative decided to close or transfer the ticket, a functionality which is very important to ENA's operations; (d) the Remedy design utilized the Remedy Help Desk 4.0 software solution, which according to Remedy literature is designed for rapid implementation of internal help desks, not the CSC available for use by ENA's customers (as opposed to ENA's internal help desk system for use by its employees); (e) PSI's Remedy Help Desk 4.0 software solution cost substantially more than the Remedy Action Request System ("ARS"), and PSI, based on its expertise, should have known that ENA's previously installed version of ARS, if properly configured by PSI, would have been adequate to support ENA's external CSC system and needs; (f) PSI grossly over-configured the hardware and software required to perform the functions requested; (g) PSI grossly overestimated the storage requirements necessary for the functions requested; (h) PSI billed ENA for "expert" consultants who, based on their performance, their reliance on vendor support and their own admissions, had little or no experience implementing the specified software, specified software versions or specified software integrations; and (i) PSI caused ENA unnecessarily to purchase, through PSI, software licenses and hardware which it did not need.

27.    Although PSI has stated to ENA that the training and end-user documentation tasks set forth in the Network Management Agreement have been completed, PSI provided untimely and inadequate documentation and inadequate training. For example, little, if any, system

administrator training was performed and the ENA CSC personnel who were "trained" on the Remedy system were not taught how to perform basic functions such as searches.

28. PSI has not provided adequate knowledge transfer or documented its procedures, processes, workflows, data associations, etc. so that what work PSI has performed for ENA is of no utility to ENA. Indeed, PSI employees have represented to ENA on several occasions that ENA will never understand how Remedy works or what has to be done to get data into Remedy.

29. PSI's consultants spent time charged to ENA in determining that the integration of Remedy and Hewlett-Packard's Open View Network Node Manager (NNM), which was recommended by PSI and sold by PSI to ENA, would not function as promised. In addition, to gain the functionality that PSI promised, PSI required ENA to purchase additional software, which should have been included in PSI's initial proposal to ENA and in the Network Management Agreement.

30. PSI employees have used time billed to ENA to educate themselves on components of the Network Management Agreement project when they already should have had such expertise based upon PSI's representations to ENA and such employees' extremely high billing rates.

31. PSI has billed under the Network Management Agreement time allegedly spent by its employees on projects for which the parties have no agreements and in excess of the contractual limitation on PSI's consulting fees. In addition, after recognizing that it had exceeded

729436.02
034050-000
06/20/2001

17

the contractual limitation on PSI's time and expenses, PSI unilaterally shifted charges originally billed under the Network Management Agreement to accounts and/or projects created by PSI.

32.     PSI has billed ENA $1,249,720.00 in consulting fees, plus $161,216.16 in expenses under the Network Management Agreement, notwithstanding that the "[t]otal project consulting cost is limited to $749,800 plus 10%."

33.     In October 2000, PSI admitted that it had exceeded the professional services fee limitation for the Network Management Agreement.  In December 2000, PSI again admitted that it had exceeded the professional services fee limitation.  In December 2000, PSI alleged that it had diverted approximately ten (10) consultants from the Network Management Agreement project to an alleged "Gateway Deliverable," a project unilaterally created by PSI, even though PSI's consultants did not work on an alleged "Gateway Deliverable."  PSI claimed for the first time at this late date that approximately $350,000 in fees for professional services previously billed by PSI under the Network Management Agreement, and which exceeded the Network Management Agreement professional services fee limitation, should instead be billed to the alleged "Gateway Deliverable."  PSI admitted that it never received written approval for the alleged "Gateway Deliverable," as was required under the Change Order Process.  PSI further admitted that no agreement between ENA and PSI existed related to any alleged "Gateway Deliverable." Furthermore, on information and belief, the consultants PSI allegedly diverted from the Network Management Agreement project to the "Gateway Deliverable" did not have the expertise or experience to work competently on any alleged "Gateway Deliverable."

34.     Among other problems with the services provided by PSI to ENA under the SQL DBA Agreement and the SQL DBA Addendum that have become known to ENA, without limitation, are: (a) PSI consultants did not work all the hours for which PSI charged ENA; (b) PSI consultants spent time charged to ENA studying for certification courses and examinations; (c) PSI dedicated consultants to absurd "make work" tasks such as "monitoring" the ENA servers by having consultants watch computer monitors for hours on end; (d) due to high turnover of PSI consultants assigned to ENA, PSI unnecessarily and improperly charged ENA for multiple consultants to learn about ENA's network; (e) PSI did not adhere to the schedule set by the parties; and (f) PSI's SQL database administrators did not focus on the projects to which they were assigned, instead working in other areas in an effort to expand the scope of their engagement, in contravention of the Change Order Process.

35.     PSI has maintained grossly inadequate, if any, timekeeping and expense records for its employees and, despite demands for detailed timekeeping and expense records to substantiate charges made by PSI to ENA, PSI has failed and refused to produce detailed timekeeping and expense records necessary to substantiate the fees charged by PSI.

36.     PSI has billed consultants to ENA at expert rates where it has been clear that such consultants have not had significant experience in their respective environments. For example, ENA's "experts" left a security hole by keeping the Demo account enabled and not password protected on ENA's production system, made code changes which were not documented properly, recommended the wrong application for ENA's CSC, left many errors (or "bugs") in code they created and did not cause the servers they sold to ENA to function properly.

729436.02
034050-000
06/20/2001

19

37. As a result of PSI's misrepresented expertise, large amounts of time have been spent by PSI consultants learning how to do the tasks which PSI represented to ENA such consultants were experts at performing.

38. PSI has not complied with its contractual agreements with ENA as to the Change Order Process.

39. PSI has not provided timely and adequate documentation of product modifications, task modifications or task additions for approval by authorized ENA personnel.

40. PSI, based on its expertise, advised ENA that it must purchase expensive Oracle software (through PSI), even though less expensive software would have sufficed. Moreover, PSI mismanaged ENA's software licensing in a number of respects, including without limitation PSI's recommendation that ENA "web-enable" an existing ENA 50-user client-server license for Oracle software, without PSI obtaining the necessary software licenses from Oracle for ENA, which resulted in ENA being out of compliance with Oracle's licensing terms.

41. PSI has not followed industry standards or the PSI Expenses Policy in charging ENA for travel and related expenses and has refused to provide backup documentation for expenses charged to ENA. ENA's review of statements for expenses charged by PSI to ENA have revealed double billing of hotel bills, charges to ENA for certification courses taken by PSI personnel, uses of multiple rental cars for employees at the same location and purchases of unnecessary insurance on car rentals in contravention of PSI's Expenses Policy.

42. On information and belief, due to PSI accepting more work than it was capable of performing competently, PSI assigned project consultants who were not regular PSI

employees but who were engaged through third parties, in contravention of PSI's representations, resulting in ENA being assigned unqualified personnel.

COUNT I
(Breach of Contract)

43.    ENA incorporates numbered paragraphs 1 through 42 above as if fully set forth herein.

44.    PSI's failure to complete the Scope of Work set forth in the Network Management Agreement, its failure to perform such work within the deadlines established in the Network Management Agreement and the other breaches set forth more particularly above constitute breaches of the Network Management Agreement.

45.    PSI's charges for consulting services above the maximum amounts set forth in the Network Management Agreement constitute breaches of the Network Management Agreement.

46.    PSI's exorbitant charges for travel and related expenses and its failure to document claims for travel and related expenses and to provide such documentation to ENA constitute breaches of the Network Management Agreement and PSI's Expenses Policy, to which the Network Management Agreement is subject.

47.    PSI's failure to provide an integrated network management system and automated help ticket process as required under the Network Management Agreement constitutes a breach of the Network Management Agreement.

48.    ENA has been damaged by PSI's breaches of the Network Management Agreement.

49.    ENA is entitled to an award of damages, in an amount to be determined by the jury, for PSI's breaches of the Network Management Agreement.

50.    PSI's charging of ENA for services under the SQL DBA Agreement and the SQL DBA Addendum which were not performed, failing to adhere to schedules set by the parties, failing to follow the Change Order Process, and the other breaches set forth more particularly above constitute breaches of the SQL DBA Agreement and the SQL DBA Amendment.

51.    ENA has been damaged by PSI's breaches of the SQL DBA Agreement and the SQL DBA Addendum.

52.    ENA is entitled to an award of damages, in an amount to be determined by the jury, for PSI's breaches of the SQL DBA Agreement and the SQL DBA Addendum.

53.    PSI's overbilling under the Windows 2000 Agreement, its failure to follow the Change Order Process and the other breaches set forth more particularly above constitute breaches of the Windows 2000 Agreement.

54.    ENA has been damaged by PSI's breaches of the Windows 2000 Agreement.

55.    ENA is entitled to an award of damages, in an amount to be determined by the jury, for PSI's breaches of the Windows 2000 Agreement.

## COUNT II
### (Breach of Express Warranty)

56. ENA incorporates numbered paragraphs 1 through 55 above as if fully set forth herein.

57. In the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum, PSI warranted that "[c]ustomized products and integration services are supported against defects in material and workmanship for a 30 day period after installation."

58. Complete installation of the customized products and integration services that are the subject of the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum has yet to be performed and ENA has not accepted any such products or services, nor have such products and services been without defects in material and workmanship for any 30 day period, all of which constitute breaches by PSI of its express warranties in the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum.

59. ENA has been damaged by PSI's breaches of its express warranties in the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum.

60. ENA is entitled to damages, in an amount to be determined by jury, for PSI's breaches of its express warranties in the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum.

## COUNT III
### (Breach of Implied Warranty of Fitness for a Particular Purpose)

61. ENA incorporates numbered paragraphs 1 through 60 above as if fully set forth herein.

62.     PSI was aware of the particular business needs of ENA with respect to the goods and services which were made the subject of the Network Management Agreement. In this regard, PSI met on many occasions with ENA at ENA's offices in Nashville, Tennessee, to learn ENA's particular, specialized needs.

63.     PSI was aware that ENA was relying and did rely upon PSI's particular expertise, skill and judgment in selecting appropriate products for use in performing the work which was made the subject of the Network Management Agreement.

64.     ENA relied upon PSI's professed expertise, skill and judgment in selecting appropriate products for integration into ENA's computer systems.

65.     PSI made no disclaimer of the implied warranty of fitness for a particular purpose.

66.     PSI has breached the implied warranty of fitness for a particular purpose.

67.     ENA has been damaged by PSI's breaches of the implied warranty of fitness for a particular purpose.

68.     ENA is entitled to damages, in an amount to be determined by the jury, for PSI's breaches of the implied warranty of fitness for a particular purpose.

## COUNT IV
### (Breach of Implied Warranty of Merchantability)

69.     ENA incorporates numbered paragraphs 1 through 68 above as if fully set forth herein.

70. PSI was, at the time it agreed to supply computer hardware and software to ENA under the Network Management Agreement, a merchant with respect to computer hardware and software used for the integration of web-based computer system networks.

71. PSI impliedly warranted that the goods and products which were made the subject of the Network Management Agreement would pass without objection in the trade under the contract description and were fit for the ordinary purposes to which such goods are used.

72. The computer hardware and software supplied to ENA by PSI under the Network Management Agreement was not merchantable within the meaning of the Uniform Commercial Code.

73. PSI made no disclaimer of the implied warranty of merchantability.

74. PSI has breached the implied warranty of merchantability in providing computer hardware and software to ENA which was not merchantable.

75. ENA has been damaged by PSI's breaches of the implied warranty of merchantability.

76. ENA is entitled to an award of damages, in an amount to be determined by the jury, for PSI's breaches of the implied warranty of merchantability.

## COUNT V
### (Negligence)

77. ENA incorporates numbered paragraphs 1 through 76 above as if fully set forth herein.

78. PSI had a duty to exercise reasonable care in making its recommendations to ENA as to the computer systems integration services which it performed for ENA and in performing such services.

79. PSI recommended a set of hardware and software components which it represented would perform as an integrated system when, in fact, PSI did not have sufficient experience with the specified components to justify a belief that its recommended system integration solution would perform as it represented to PSI.

80. PSI breached its duty to exercise reasonable care in recommending a computer system integration solution for ENA.

81. PSI breached its duty to exercise reasonable care in implementing a computer system integration solution for ENA.

82. ENA has been damaged by PSI's negligence.

83. PSI's negligence was the proximate cause of the harm caused to ENA.

84. ENA is entitled to an award of damages, in an amount to be determined by the jury, for PSI's negligence.

## COUNT VI
### (Intentional Misrepresentation)

85. ENA incorporates numbered paragraphs 1 through 84 above as if fully set forth herein.

86. PSI knew that the computer system integration recommendation it made to ENA would not perform as promised, was grossly over-configured, was overly complex, and would

not provide an adequate solution to the needs of ENA as identified by PSI and as articulated by ENA to PSI.

87. PSI represented to ENA that the Remedy system implementation it recommended and which is made subject to the Network Management Agreement would provide ENA with the ability to automatically handle external trouble tickets and the ability for its customers to view trouble tickets via web interface, enabling all end-users to check the current status of their open trouble tickets.

88. PSI knew that the recommendation it made concerning the Remedy system referenced in the preceding paragraph was false or that it did not have sufficient basis or information to make this representation.

89. PSI's representations that the computer system integration recommendation it made would perform as promised were false.

90. PSI intended to induce ENA to act in reliance upon its representations concerning the Remedy system and its computer system integration recommendation to ENA.

91. ENA justifiably relied upon PSI's recommendations concerning the Remedy system and its computer system integration recommendation to ENA.

92. PSI knew that it did not have the expertise to perform the work it represented it could perform for ENA and agreed to perform for ENA.

93. PSI's representations that it had the expertise to perform the work it represented it could perform for ENA and it agreed to perform for ENA were false.

94.     PSI intended to induce ENA to act in reliance upon its representations concerning its expertise and competence.

95.     ENA justifiably relied upon PSI's representations concerning its expertise and competence.

96.     ENA has suffered damages resulting from its reliance upon PSI's representations.

97.     ENA is entitled to damages, including punitive damages, in an amount to be determined by the jury, for PSI's intentional misrepresentations.

98.     ENA is entitled to rescission of the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum due to PSI's intentional misrepresentations.

## COUNT VII
### (Negligent Misrepresentation)

99.     ENA incorporates numbered paragraphs 1 through 98 above as if fully set forth herein.

100.    PSI should have known that the computer system integration recommendation it made to ENA would not perform as promised, was grossly over-configured, was overly complex and would not provide an adequate solution to the needs of ENA as identified by PSI and as articulated by ENA to PSI.

101.    PSI represented to ENA that the Remedy system implementation it recommended and which is made subject to the Network Management Agreement would provide ENA with the ability to automatically handle external trouble tickets and the ability for its

Case 3:01-cv-00318-GCM   Document 3   Filed 06/20/01   Page 29 of 35

customers to view trouble tickets via web interface, enabling all end-users to check the current status of their open trouble tickets.

102. PSI should have known that the recommendation it made concerning the Remedy system referenced in the preceding paragraph was false or that it did not have sufficient basis or information to make this representation.

103. PSI's representations that the computer system integration recommendation it made would perform as promised were false.

104. PSI intended to induce ENA to act in reliance upon its representations concerning the Remedy system and its computer system integration recommendation to ENA.

105. ENA justifiably relied upon PSI's recommendations concerning the Remedy system and its computer system integration recommendation to ENA.

106. PSI should have known that it did not have the expertise to perform the work it represented it could perform for ENA and it agreed to perform for ENA.

107. PSI's representations that it had the expertise to perform the work it represented it could perform for ENA and it agreed to perform for ENA were false.

108. PSI intended to induce ENA to act in reliance upon its representations concerning its expertise and competence.

109. ENA justifiably relied upon PSI's representations concerning its expertise and competence.

Case 3:01-cv-00318-GCM    Document 3    Filed 06/20/01    Page 30 of 35

110. ENA has suffered damages resulting from its reliance upon PSI's representations.

111. ENA is entitled to damages, in an amount to be determined by the jury, for PSI's negligent misrepresentations.

112. ENA is entitled to rescission of the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum due to PSI's negligent misrepresentations.

## COUNT VIII
### (Tennessee Consumer Protection Act)

113. ENA incorporates numbered paragraphs 1 through 112 above as if fully set forth herein.

114. PSI's acts and practices, as described in further detail above, in billing ENA for work never performed and for work in educating its own personnel at the expense of ENA, in violation of PSI's representations about the purported expertise of its personnel, in charging ENA for time spent on projects for which PSI had no contract or other agreement with ENA, in failing to record and provide to ENA detailed time records for the consulting services for which PSI charged ENA, in charging ENA inflated and improper travel and related expenses, in failing to record and provide to ENA backup documentation for travel and related expenses for which PSI charged ENA, in representing that it had expertise and competence that it did not have and in recommending and selling to ENA computer hardware and software which were unnecessary, inappropriate and far more expensive than ENA needed and which did not perform as promised, constitute unfair and deceptive trade acts and practices in violation of Tenn. Code Ann. §§ 47-18-104(a), -104(b)(5), (13), (19) and (27).

115.     ENA has been damaged by PSI's unfair and deceptive trade acts and practices in violation of Tenn. Code Ann. §§ 47-18-104(a), -104(b)(5), (13), (19) and (27).

116.     Pursuant to Tenn. Code Ann. § 47-18-109(a)(1), ENA is entitled to bring a civil action against PSI for the actual damages caused to ENA by PSI's unfair and deceptive trade acts and practices.

117.     PSI's use or employment of the unfair or deceptive acts or practices referenced above was a willful or knowing violation, warranting an award of three (3) times the actual damages sustained and such other relief as is necessary and proper.

118.     Pursuant to Tenn. Code Ann. § 47-18-109(e)(1), ENA is entitled to an award of its reasonable attorney's fees and costs in this action.

COUNT IX
(North Carolina Unfair and Deceptive Trade Practices Act)

119.     ENA incorporates numbered paragraphs 1 through 118 above as if fully set forth herein.

120.     PSI's acts and practices, as described in further detail above, in billing ENA for work never performed and for work in educating its own personnel at the expense of ENA, in violation of PSI's representations about the purported expertise of its personnel, in charging ENA for time spent on projects for which PSI had no contract or other agreement with ENA, in failing to record and provide to ENA detailed time records for the consulting services for which PSI charged ENA, in charging ENA inflated and improper travel and related expenses, in failing to record and provide to ENA backup documentation for travel and related expenses for which PSI charged ENA

in representing that it had expertise and competence that it did not have and in recommending and selling to ENA computer hardware and software which were unnecessary, inappropriate and far more expensive than ENA needed and which did not perform as promised, constitute unfair and deceptive trade acts and practices in violation of N.C. Gen. Stat. § 75-1.1(a).

121.    ENA has been damaged by PSI's unfair and deceptive trade acts and practices.

122.    Pursuant to N.C. Gen. Stat. § 75-16, ENA is entitled to an award of treble the amount of damages, an amount to be determined by the jury, caused by PSI's unfair and deceptive trade acts and practices.

123.    Pursuant to N.C. Gen. Stat. § 75-16.1(1), PSI having willfully engaged in the unfair and deceptive trade acts and practices complained of herein, and there having been an unwarranted refusal by PSI to fully resolve the matter which constitutes the basis of this suit, ENA is entitled to a reasonable attorney fee if it prevails in this action.

124.    ENA reserves the right to amend this counterclaim upon further investigation and discovery.

<u>JURY DEMAND</u>

125.    ENA demands a trial by jury.

# PRAYER FOR RELIEF

WHEREFORE, ENA, prays that:

A. Judgment be entered in ENA's favor and against PSI on ENA's claims for breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, negligence, intentional misrepresentation, negligent misrepresentation, violations of the Tennessee Consumer Protection Act and the North Carolina Unfair and Deceptive Trade Acts and Practices Act;

B. ENA be awarded damages, in an amount to be determined by the jury, including ENA's compensatory damages, consequential and incidental damages, including without limitation ENA's lost profits and damages for loss of use of funds, punitive and treble damages;

C. ENA be granted rescission of the Network Management Agreement, the SQL DBA Agreement and the SQL DBA Addendum due to PSI's intentional misrepresentations and negligent misrepresentations;

D. ENA be awarded its reasonable attorneys' fees, expenses and costs incurred in seeking the relief requested herein;

E. ENA receive a trial by jury; and

F. ENA be granted such other and further relief as the Court deems just and equitable.

This the 20th day of June, 2001.

Respectfully submitted,

_____

John H. Cobb (No. 17052)
SMITH HELMS MULLISS & MOORE, L.L.P.
201 North Tryon Street (28202)
P.O. Box 131247
Charlotte, North Carolina 28231
(704) 343-2000

OF COUNSEL:

_____

Michael Bressman
General Counsel
EDUCATION NETWORKS OF AMERICA, INC.
1101 McGavock Street
Nashville, Tennessee 37203
(615) 253-1999

_____

Paul A. Alexis
Thor Y. Urness
BOULT, CUMMINGS, CONNERS & BERRY, PLC
414 Union Street, Suite 1600
Nashville, Tennessee 37219
(615) 244-2582

*Attorneys for the Defendant and Counterplaintiff,
Education Networks of America, Inc.*

729436.02
034050-000
06/20/2001

34